May it please the court, my name is Paul Alston. I represent the appellants, the Queen's Medical Center and other affiliated parties. Judge Kobayashi erred as a matter of law in granting this preliminary injunction. Our brief discusses four ways in which that's true. Today I'll discuss two and if time permits a third. First, she erred by determining as a matter of law that plaintiffs have a reasonable likelihood of success. She based her decision in that regard on two claims that they put forth. One was the claim that they were entitled to some process in connection with this business decision to close the Radiation Oncology Department and to make the facilities available only to doctors who were employed at the Queen's Medical Center. Judge Kobayashi said that triggered rights under the silver case, the White Supreme Court case that extends some privilege of some right of process in the event a public or a quasi-public facility terminates a doctor for some misconduct or some negligence or incompetence. None of that occurred here. What we have is a decision made by the Queen's Board based on a business determination that its patients would be best served by a closed model, which is the kind of operating system that is common throughout the country, and that it would be best then to terminate the collaborative relationship between the doctors of Pacific Radiation who were operating both their own private facilities on the outside and exploiting the more sophisticated equipment at Queen's for their benefit. But the practical effect was to deny them privileges. No, it was to foreclose them from exercising their privileges, but as a technical matter, they still have their privileges. They just can't exercise them. That's true. And that is a distinction. Well, so why isn't it fair under silver to say we realize that there is a difference as you're not extinguishing their privileges, but you're effectively preventing them from exercising the privileges, and that may be a due process violation? Well, two things, Your Honor. First, it is clearly not a due process violation in the sense that there's no State action. Well, let me return to that in a second. But let's assume that there's State action or at least some action that would give rise to governmental involvement. We'll come back to that. Okay. To just talk about the process issue. Well, the process is triggered when there is some individualized allegation against the doctor. And here, there were none. What there was, as reflected in the resolution of the board, it was a determination that the quality of patient care, the continuity of patient care would be best served by the closed model. I understand that. But why wouldn't the doctors be entitled to argue that was pretext? Well, they We're just talking again about the right, not necessarily whether they are the ultimate resolution of this, the theory. Well, but again, going back to that, if it is made on a systemic campus-wide basis and not an individualized determination against them, then there is no basis for them to argue that it's a pretext. I mean, and in fact, there's no evidence in this record that it is a pretext. But here, the notion that it was a pretext for some individualized fault-based decision is undermined incompletely by the fact that the hospital offered every one of these doctors the opportunity to be employed by Queens Medical Center. If there was anything wrong with their skills, if there was anything wrong about them, they would obviously not have been offered a job, but they were. They turned it down. They turned jobs down, but the fact that they were offered jobs demonstrates this isn't the kind of negative decision that would trigger any right of process. But Judge, the district court felt that at least Silver might extend that far. And you just think that she was flat wrong. I think as a matter of law, she was flat wrong. I think Silver teaches that it has to be some misconduct-based, some fault-based determination against an individual doctor, not a systemic determination that the hospital will run better, that patients will receive better care by changing the business model. And so in that respect, I would think she did misread Silver. She also misread Silver as applying to private institutions. The Hawaii Supreme Court, back when the state was the territory, said the Queens Medical Center is a private institution. We know that the Silver Doctrine applies to public and quasi-public institutions. The plaintiffs had every opportunity to come forward with sufficient evidence to raise or to demonstrate that Queens was quasi-public, and they did not do that. What they've come forward with is the letterhead, evidence that in 1859, the then Queen supported the founding of the hospital. But the Hawaii Supreme Court has said it's private, and there is simply no basis to believe that there is a reasonable probability, a reasonable chance that the plaintiffs can get beyond that decision. I realize that their claim is founded on the 14th Amendment and Silver. But perhaps you could answer a question sort of ancillary, which is, what about the fact that this entire operation is governed by the Nuclear Regulatory Commission? Are there rights under the Fifth Amendment that are triggered by that, in terms of termination or denial of licensure? The reason I say that is it may go to jurisdiction. I mean, because we may not have a, there might not be a jurisdictional hook here at all. Well, the jurisdictional hook that the district court found exists was based on the Claim 7, which is the antitrust case. Yes, but we'll get to Claim 7, but I just want to ask you about Claim 1. I mean, does that change the context when you're talking about not only about denial of privileges, but in a sense, amendment of the federal license, which only authorizes certain physicians to perform these procedures. And I assume that Dr. Leder and his fellow physicians were listed on the QMC federal license, right? I do not know that, sir. But I do know that their ability to use nuclear material was unaffected. At the time the decision was made- Except they couldn't use it at your hospital. That's right. Because at the time the decision was made by the Queen's Board, there were, in fact, other facilities available at which the material could be used. And I don't know that, they have not argued, and there's nothing in the record to support the notion that the impact on their ability to use the material at Queen's somehow implicated a question of federal law. And so Judge Kobayashi was wrong in her reading of Silver and her application of process rights there. She was also wrong with respect to the claim for unfair competition. There she made two errors. The first was that, what she claimed was, or what she determined, was that, quote, the manner and timing of the decision was unfair and that therefore triggered a claim under Chapter 480. Well, there is, in fact, nothing about either the manner or the timing that would entail the kind of anti-competitive conduct that triggers Chapter 480. Second, and more importantly, or equally important, I should say, the problem is that under Chapter 480, it's necessary to prove not just an economic injury, but an antitrust-related, a competition-related economic injury. And the Tenth Circuit, just last month, issued a ruling in one of the cases that the plaintiffs rely on very heavily, the case is Colmia. Colmia versus St. John Medical Center. And it was cited under a different name. It was cited as Colmia versus Argent. But in that case, which the plaintiffs rely on for establishing their unfair competition claim, the Tenth Circuit affirmed a grant of summary judgment, finding that the doctor had not proved any antitrust injury because, they said, a staffing decision does not rise to the level of antitrust injury, or an adverse staffing injury decision doesn't do that. Unless it affects competition as a whole. And the court went on to say that in order to recover, Dr. Colmia must show that patients were denied access to services in the relevant market. Here, there is no dispute that every service that any patient might want or need was always available before and after the decision about the closing the radiation oncology department. Doesn't it somewhat depend on the market? And by that I mean, if you're in a large urban, let's say you're in Los Angeles where you have multiple options. That's certainly true. But if you're in a smaller market, such as Honolulu and other places, where then you are actually having one institution that becomes the sole provider. Doesn't that raise a different kind of question in terms of antitrust injury? Perhaps, but not in this case. And I say that for two reasons. One, the decision here was made when there were multiple institutions available to provide this service. And the record reflects that there will, again, in the very near future, be multiple institutions because the plaintiffs themselves are building the facilities- Right, but not now. But not for this very short period of time. The second thing is that the services were available. The patients could always be served at Queens. Not perhaps by the doctors that they might want, but the services were available. So that- Why does that answer the monopoly question? If you're saying we always have the services, but if you go to our monopoly, I don't think, how does that satisfy the antitrust inquiry? Well, the antitrust claim never arises for two reasons. Any monopoly that might be thought to exist during this short period of time- Well, there's a monopoly. I mean, the question of how it plays out in the future is different. Well, there- For the short period of time, you can see that. For the short period of time, and with respect only to certain types of services, the antitrust law makes clear, and the Supreme Court has expressly said this, that a monopoly is not problematic legally if it arises as a result of a historical accident. Here, it was the closure of other facilities, and it was the failure of the plaintiffs themselves to build their own fully competitive services that creates the monopoly. If Hawaii Medical Center hadn't closed, an event which Queens did not cause and had nothing to do with, or if the plaintiffs had built bigger and better facilities on their own instead of free riding on Queens facilities, then the closure of Queens Department would not have caused any sort of competitive harm. So Queens can't be faulted for the fact that the closure resulted in certain services being available only at Queens facility. So with respect to the unfair competition claim, we have both her determination that the manner and timing were inappropriate. Her reference to the manner of decision can only relate back to the process. If no process was due, there was nothing wrong with that. Her comment about the timing can only relate to the fact that we didn't give time for them to build out their own fully competitive facilities. But there is nothing in the law that would say it's unfair to give a competitor a boost up while they build out their own facilities to become more competitive than before. So- Over your time all expired, you're down to six minutes, 30 seconds. Yes, I would like to- Could you address the jurisdictional issues that were raised? Yes, I'd be happy to do that. You removed it from the state court. We did, we did, and at the time we removed, it appeared that good counsel on the other side had pleaded a 14th Amendment claim that they believed they could muster enough facts to demonstrate there was some state action. As it developed, they couldn't, there isn't, there's simply no way to sustain that basis. And that's what Judge Kobayashi found. As to the other basis for jurisdiction, the seventh claim, that claim is grounded on and intricately tied into their anti-kickback statute claim. They say that- The anti-kickback claim, per se. I beg your pardon? It's a state anti-competitive, it's a state unfair practice. That's right, but what they say is we've been, we are the victims of unfair competition because Queens is engaging in conduct which violates- Why does that claim have to be litigated in federal court? Well, no claim, a very- That's a criminal statute, there's no private cause of action there. There is not, but it is arguably the foundation for the state claim. And because- I understand, so why is it necessary that it be litigated, that only the federal court can decide that? It is neither necessary nor essential that it be litigated here, but it can be litigated here. In the sense that the state courts don't have exclusive jurisdiction over this issue, and the proper interpretation of the anti-kickback statute, which is the sole rationale for that particular claim, is an issue where, frankly, we have greater faith in the federal courts to properly interpret that statute than we do in the state courts. And that's what- What interpretation will need to be done? What's that? It seems to me the federal jurisdiction, on that count, or the federal anti-kickback statute needs to be interpreted by the federal court. So in your judgment, what would, if this claim proceeded, what would the district court need to do to interpret that statute? Frankly, Your Honor, that particular claim has not been briefed, argued, or illuminated through discovery. I am not sure- But you removed it. I did. I did, but I am not sure- The reason I ask is that there are cases where you're saying, here's the federal standard, and so it's a negligence per se claim. And I gather you don't think this is that kind of case. No. And tell me why. Because I think that if they have a viable claim on the anti-kickback statute, it will depend, it will be very fact dependent. And I don't know at this point what facts they think they can muster to establish that claim. We just don't know. The pleading is, and we attacked this claim on nine B grounds among others, but the pleading is not particularly illuminating. All I know is they think that some aspect of federal law triggers some rights they've got, and we believe that the federal court is a better source of good law on that issue than the state court will ever be. What's the status of the litigation for the district court today? Basically, nothing has happened since the appeal was taken, except some very preliminary discovery requests. Did the district court enter a stay of some sort? No, when the district court entered the injunction, the parties worked cooperatively and in an amicable way to implement that. But because of the pendency of the injunction, neither side has. And the other is working under the injunction. He is. He's the only one who's working under the injunction. And I understand he's referring some procedures to people at Queens and doing some himself. And we just, it's, there haven't been problems with the implementation of the injunction, per se. So, I'd like to reserve the rest of my time, if I could, for rebuttal. Good morning. May it please the court. My name is Claire Connors and I represent the plaintiffs at police in this case. I'll start out by addressing some of the concerns or some of the issues that were raised by defense counsel. First of all, the district court, and again, the review of this court is going to be under an abuse of discretion standard, where one would have to find that it was implausible that any inferences drawn by the court could actually be drawn as such. In this case, the district court had an evidentiary record before her, which indicated that this was not a legitimate business decision, immune from the kind of scrutiny that silver allows to the limited degree that it does. In this case, if you look at the TRO proceedings, when the court originally got this matter before her, which, as the court has noted, was right on the same day that we were supposed to proceed in state court on this case, but when she first got it, she looked at the justification that was presented by Queens, and she couldn't honestly say that this is not sound, it's not legitimate, it's not unreasonable. It wasn't until she, but she did, of course, identify reputable harms and things of that nature, which were the basis of her temporary restraining order. Then, when evidence was received in this case, leading up to the preliminary injunction order, she took a look at the evidence that was submitted by the defense, and she realized that what they had said was a legitimate business decision was, in fact, absolutely not just that. When you look at the affidavits that were submitted, the affidavits of Darlena Chadwick, the affidavit of Dr. Greenwood, of Dr. Moon, what she found, and you can see her discussion of this in the order, is that they were absolutely basing this decision, at least in part, in substantial part, on professional misconduct concerns about the plaintiffs. And at that point, she realized that due process under silver was clearly triggered. In this case, the allegations were, in Darlena Chadwick's affidavit, to the danger that these alleged transferring procedures were causing to patient safety, to the ability to provide adequate patient care. When you look at Dr. Greenwood's affidavit, he said that he, as part of the task force, had been asked to commence an investigation. And he uses those words, which are important words to use, because when you say you're commencing an investigation, that implicates the medical bylaws, which specifically determines how an investigation is to take place. And that's in the record, ER 752, it sets forth. When you have an investigation, as Dr. Greenwood called it, at that point, due process is implicated. And at that point, the plaintiffs, in this case, the doctors whose conduct is being targeted in this case, the evidence clearly showed that, and the court was very concerned about that.  They do have a right to due process. Doesn't the, all of the plaintiffs who are offered employment at the hospital? Right. Now, that's interesting. That goes to the merit of these complaints in the very beginning and in the very outset. If these complaints that were raised that would form the basis of this policy decision were as severe as the defense counsel makes them out to be in their pleadings, then they absolutely should have been the basis of a due process proceeding. The offer of employment goes to the second basis that the court found this policy to be unreasonable, arbitrary, and capricious. Because that goes to the anti-competitive intent. What Queens did is they adopted a board resolution that was to address, quote, the transferring practices of doctors for these particular doctors, individualized, particularized, identified doctors. They're transferring processes of patients for no medical reason or patient request. When finally these issues got litigated and the plaintiffs had an opportunity to address them by virtue of this litigation, it became clear through the rebuttal affidavits and the affidavits that were submitted to the court, that there was at least a plausible basis for medical reason. The plaintiffs had two devices that Queens did not have. They had a Calypso device. They engaged in this prone breast cancer treatment that reduced the amount of time that would be necessary to administer these radiation therapies. And the evidence also indicated that it absolutely was patient request that was the basis of determining where these procedures would take place. And that the plaintiffs did not transfer patients but for a patient request when such was made because of location, perhaps, or because of the type of treatment. So by virtue of the fact that these allegations, when finally the defense was so unfounded, is exactly the reason why the case law demonstrates a hearing would have yielded important findings, certainly as to the due process considerations that the plaintiffs are concerned with. But also, under Silver, as to the ability of the court to make any determination at all about whether or not this was a reasonable policy. And that's all the court wants to do. Silver, when you read it, is very, very careful about delineating when it is appropriate to take this kind of judicial review. And to exact some kind of determination. And the court in this case was very, very concerned about it throughout it. I'm not a doctor, she said. I'm not the one who should be making these decisions. But what the court can make a decision about, and what is very much in the province of the court, is whether or not due process was afforded. And that's why we cited to the Strauss case. Because the case is cited to, by the defense for the most part, deal with a factual record where it was determined that the policy decision was legitimate, had a very plausible justification. That's not this case. That's not what this record shows. That wasn't what Strauss showed. And we cited Strauss because it not only factually kind of mirrors this case, involved radiation ecologists, but in the end, this is what the Strauss court found. There can be little question but that the board of trustees made what on its face is a management decision when it elected to bring order to the radiation ecology program by undertaking to reorganize it. However, the summary judgment record establishes as a matter of law that the board acted on a basis of mixed motives. The potential for harm arising from the board's undisputed actions to plaintiffs reputational, professional, and economic interests was real and substantial. The bylaws are intended in part to protect those interests. And that's why this case was adjudicated the way it was by the district court. Because of the evidence before it as to what had actually ensued and what had actually justified the basis for the hospital's actions. This was not systemic. Plausibly, on its face, could have been such. But when the evidence came to light, it clearly was directed at the conduct of these plaintiffs. So, how do you get to the quasi-public prong? Sure, and with respect to silver, silver, we have argued- Well, there are two things. First, you have to, there's silver, which defines quasi-public. And second is whether or not, in terms of federal jurisdiction, even if it's quasi-public, does it equate to state action? And I'll address first the silver issue. And again, the standard here is abuse of discretion, a likelihood of success on the merits. And in this case, what she found is under silver, the unique status of Queens as having been established by the monarchy. Then the government of the state of Hawaii, or of Hawaii at that time, was an important and unique characteristic that fit into the silver model. Now, as the record has developed on appeal, mostly from the case law, and we cited a number of cases, Hite, which was a case raised by the defense, Inree, Queens Hospital, a number of cases. You see that there is substantial legislative appropriations that are being made to Queens from its inception. And in fact, I think Inree, Queens talks about a designated amount of legislative funds being appropriated on a regular basis to Queens. That fits the silver test. The silver test on a factual basis dealt with this hospital, Castle Memorial, which was a private hospital, but for the fact that it received, at its construction, funds from the government. So based on that test and the factual circumstances, and again, silver noted that the record hadn't been fully developed on this too. But that very limited basis, we survived the silver test, because it's clear that at its construction, there were receipt of funds from the legislature. If you look at the Queens website itself, which they discussed, it's clear that at the time that these funds were solicited, $6,000 of the total amount was from the legislature. And then throughout time, there were also funds appropriated by the legislature. It meets that minimum test set forth in silver. And of course, then the record, and I'll now move into the second point as to the 14th Amendment. The record is then, from that point on, rather silent about what types of funding was received by Queens. And our position as to the jurisdictional issue is that there were colorable 14th Amendment claims that were set forth in the complaint. And that at this point- So the only allegation about federal law is a constitutional violation. There's no argument about state actors or state action. Right, and- No facts are alleged in the complaint. And that's the issue. Had we known- We started out in state court. You didn't intend this to be in federal court. Well, that's absolutely true, Your Honor. And had we known we were going to be in federal court, we might have articulated things a little differently. But at the end of the day, where we're left here, is we're left with an evidentiary record that is not developed. And you find that the court did not rule specifically on count 14. If you look at ER 166 and 167, she says that it is unclear on the record whether or not that claim has merit. And then, by virtue of the arguments that were raised by the defense as to count 7, which the court quickly agreed with and said, okay, well, as to count 7, it looks like we're okay here. Then the 14th Amendment was tabled. It wasn't further examined by her on an evidentiary level or in a matter that would be necessary in order to make out whether or not the state actor claim under the 14th Amendment exists. So that's our position saying, at least on its face, under Oneida, it's facially valid, whether or not it ultimately stands on the evidentiary record has yet to be determined. That all aside, jurisdiction under the supplemental jurisdiction prong still could be found to- As long as the court properly exercised original jurisdiction over something. Right, and in this case, we say, using the facially valid language in Carlsbad, and also in Oneida itself, that it's not so implausible in this case that given the clear circumstances that are unique to Queens, whether or not they ultimately are determined on a factual level to make Queens the kind of entity that does assume the characteristics that are necessary to meet the Chudikov test and the Ninth Circuit test, that's an evidentiary matter. And whether or not that's even dismissed for failure to state a claim in Carlsbad, where there were cases that were dismissed for failure to state a claim at all, jurisdiction was found still to be valid on a supplemental level, no matter how on the merits the federal claim is adjudicated. So to that we- Does the seventh claim meet the test of Grable, the federal anti-kickback statute? Well, I would argue, I'll be, it's clear from the pleading that we argued it within the confines of the State 480 claim, and that it was a standard of lawful conduct that we were related to, that we were discussing, and that was of concern to us. But yes, it is going to require consideration of federal case law. It's going to require consideration- That wasn't my question, though. Does it meet the Grable standard? Is it embedded? Yeah, I think the second prong of the Grable standard, whether or not there's a substantial federal question raised, I think it could be found to raise that. The kind of evidence that we're going to be considering is whether or not the supplemental compliance guides that were issued by the federal government adequately define this remuneration, which we say is absolutely what they were attempting to obtain when they took the referral sources and the- Do you really care whether you're in federal court or state court as long as you preserve the preliminary injunction? At this point, we want to make sure we preserve the preliminary injunction. At this point, our clients have been a little bit whipsawed by how things have played out, and that was raised at the time that this was removed, too, because it was the day before this policy was to be implemented. We do think that there are grounds, at this point in time, for keeping it in federal court, because the court has certainly exercised or- She did a lot of work. She did a lot of work. She expended a lot of judicial resources. Both parties have expended a lot of judicial resources, and we think that there is a basis that it survives in the supplemental jurisdiction. Let me ask you this about Hawaii law, in terms of unfair competition. Do you believe it's coextensive with federal antitrust law? It seems to be a little broader than federal antitrust law. It is, I think it is, and I think that- But did the claims in this case, in your view, fall within federal antitrust law so that you could have pled a federal antitrust theory that did not, within the concentric circles of state law, that you could have pled a federal theory that was viable? Under the Sherman Act, for example? Yeah. I think it's plausible, under the facts, that we could have done so, and again, if we knew we were headed to federal court, that was- I guess the point being, if this gets down, further down the chain, and you amend, do you think you have viable federal theories? I would say that we would certainly consider whether or not we do. I mean, we have alleged antitrust, we have alleged conduct, anti-competitive conduct under the state law, and to the extent that it mirrors what's happening in federal court, I don't feel comfortable completely discussing- No, I understand that, but as we're looking at jurisdiction, we've got to look at the panoply of what we're thinking about down there. If there's a possibility of amendment, for example, to assert a federal theory, if we found the current theories wanting in terms of jurisdiction, then that's something I suppose we should consider. I mean, all the parties have put in a lot of work. The district court's put in a lot of work. Mm-hm, mm-hm. Yeah, I do think so. So that's the reason for my question. Right, and I do think by virtue of the fact that we've cited, both sides have cited substantial federal law on the anti-competitive component and what quantifies or what qualifies as an anti-competitive injury or an antitrust injury, I think that is plausible. It would be something that we would certainly look at. I do want to be clear that with respect to the antitrust, if I could just address that for a moment, the defense has said, you know, this is a situation where the plaintiffs are really only talking about harm to themselves and it doesn't impact the market. Well, that's absolutely, that couldn't be further from the truth. This is a situation where the court specifically found that there was going to be antitrust injury or anti-competitive industry to the plaintiffs. Now, the interesting thing that I do want to raise to the court, too, is the way that the posture of this case has aligned the plaintiff's interest with those of the patients. There was a motion to intervene by the plaintiffs at the state court level. When it was removed, the defense did not remove that, but it ultimately was adjudicated. And the reason the case or the intervention of the patients was disallowed by the court is because the court adopted the reasoning of the defense. The defense objected to the plaintiffs, the patients participating in this case because it said that the interests of the patients were going to align with the plaintiffs. The court agreed with that, which specifically makes this a case distinct from all the cases that have been cited by the defense. This is a case where the plaintiff's injuries align with those of the patients. And because the court is dealing with the other three prongs, irreparable harm, public interest, those interests of the patients, whether they come in as third party interests or because they are aligned with the plaintiffs, as the posture of this case has, are validly before the court. And the district court in this case was very careful in her consideration of irreparable harm. She grouped the patients into groups one, two, and three. She gave very careful consideration to the interplay between referring physicians and the interplay between patients and the ability of the physicians to provide the quality of care that would have been warranted. And to say that that, under an abuse of discretion standard, doesn't fly at the end of the day would be a very difficult finding to make based on this record. Let me ask you about what Dick Pye has asked you about. He said you originally wanted to be in the state court. And that your desire to now be in the federal court is because you want to preserve the preliminary injunction? Well, at this point in time, we think that the federal court, by virtue of supplemental jurisdiction, will adequately address the concerns that we've raised in the state pleading. We did not move to revand. At this point, we don't have any desire to revand. We think that the matters as they've been litigated and will likely be litigated as this case moves through the various dispositive motions hearings and stuff, can be adequately done and very well done by this particular district court. So at this point, we prefer to stay in federal court. And it's not as though, because we originally filed in state court, that we want to go back there for any other reason. We think that this district court can adequately apply the state law where it's needed, and then appropriately apply the federal law where that's needed as well. I do want to say, with respect to the nature of this injunction, what's before the court is a very limited, very narrowly tailored injunction that was crafted after very careful thought was given by the district. No, I, it's a comment. When you keep saying this particular district court, assuming you mean this particular district judge. Yes, sorry. Thank you, I do. Judge Kobayashi. That's all right. It's, you know, making your judgment on where you'd rather be on a particular district judge is sometimes not very wise, whether you'd rather be in a state court or a federal court. Because once you get rid of the district judge, or once you get through the district judge, you then have to face a particular appellate panel. And you're bet on how good that's going to be. As to the merits of the case. As to anything. When you look at the judge, and you look at the court above it, don't believe the newspapers about what kind of a court this is. Very, very validly taken, Your Honor. I think at this point, I'm just, with respect to the order that was rendered by this judge, if I could clarify the way it was characterized. That's all right. I just say when you make, most, a lot of lawyers, when they make the judgment about where to file a case, make a judgment about, not the individual judge they're going to get, but how that court is in general on their issue. And I would say that when counsel makes a decision to remove a case, that same calculus comes into it. Right, and you may have made the right judgment when you started. Right, and actually, as it turned out, we didn't have much choice as to what judge, or what court we were in, but with respect to how it's played out now, we think that there have been substantial renderings by this court, and this judge, and that those are important with respect to the interests of our clients. Also, as to the injunction itself, I would direct the court to excerpts of record 22 to 23, where the court discusses the supplemental pleadings that were filed by the defense. And in this case, the defense, in effect, conceded that there are certain procedures that cannot be performed, that with respect to those procedures, the ability for the plaintiffs to perform those procedures would be eliminated. As to those procedures, there would be an elimination of competition. And then it considered the procedures that were also being asked to be enjoined by the plaintiffs. At the end of the day, the defense's position was the one that was adopted by the court. So the court, in tailoring those eight procedures, and in allowing for this injunction, actually went with those procedures that were identified by the defense. There again, rendering this something that the defense has itself determined are necessarily performed at Queens for this limited, temporary period of time, which is all we're talking about with respect to this injunction. I ask you two practical questions. First is, when you're talking about this temporary time, what are we talking about in the real world? I mean, that's the time at which your clients will have constructed and have licensed similar treatment facilities. Right, and that is something that the district court is monitoring. The district court is having... No, I'm just asking you for your estimate of time, best you can. It's, there are certain aspects, certain procedures that could be performed at alternative facilities as early as December of this year. Those are the prostate treatments where there's a surgical site available, and those are one-day procedures, and that can happen. There are other procedures like the administration of HDR brachytherapy, where you need a full-scale emergency room to perform those procedures. And that, given the current situation in the medical community here in Hawaii, is not so readily found by the clients at this point. They are looking into alternatives, but at that point, at this point, it's hard to say that there are alternative facilities even available for those procedures to be performed. Second question is, what struck me about all this is that there are some larger issues. There's no question about that. But really what this case is about is this appeal, which is the preliminary injunction. What this appeal is about is to try to work through a transitionary period. And my question to you, and I'll ask your opponent too, is we do have a circuit mediator, and if that would be of assistance to you, I don't know. It doesn't affect our decision at all. We'll take the case as it comes. But have you, I suppose you've been through a mediation process, or not? We haven't at this point, and that is our position. What the district court did with this injunction was just allow for a reasonable transition period of time. There was a questionnaire, a mediation questionnaire. We filled it out that we'd be willing to mediate this. Right, but this is an emergency appeal, and you needed to get a decision expected. Right, an emergency appeal that was brought by the defense the day after the order was issued. But with respect to how this will work out, defense counsel is correct that there are conversations that are happening with the magistrate judge at this point, and that there are conversations about how that could happen outside of the litigation context. Because their tactical position is somewhat different, I expect, from their practical position because now they've got a preliminary injunction order that they have to worry about the ultimate effect on the outcome of the case. And I assume that they might be willing to work through a transitionary period agreement. Right, and that's at the outset what our clients had tried to do at the beginning. Yeah, okay. So that is something that our clients have throughout this proceeding because, again, it's about the patient care and their patient care issues. That's something that our clients would absolutely be willing to do. And lastly, I'll just comment on this historical accident idea that, you know, the closure of these two hospitals where our clients could perform their procedures was historical accident. That's not what the court found. The court found that as to the anti-competitive conduct, it was the board resolution identifying the transferring of patients and the, well, specifically in the court's order, the conditioning of employment. Now, in that context, as this was all happening, again, bankruptcy was filed in June prior to the implementation of the Queens's policy for the HMC facilities. But as this was happening, the manner and timing where those limitations now in the plaintiff's ability to provide care became acutely clear to Queens, that was still an unreasonable policy in light of the conditions as they came to be before the policy was implemented. So that's an important distinction when they say, oh, it's a historical accident. We didn't have anything to do about it. Well, the anti-competitive aspect is with respect to the board resolution and the conditioning of employment in the way they did that would have eliminated the competitors. So at the end of the day, this is a very limited, narrowly tailored injunction. It only enjoins Queens to the extent that we're talking about one doctor, a handful of procedures under an abusive discretion standard. It should be upheld, and it should be upheld until the period of time where a reasonable transition can be accomplished. Thank you, counsel. Thank you. My colleague is wrong about two facts. First, she says that multiple patients attempted to intervene. In truth, one attempted to intervene. That patient was already in a course of treatment at Queens, and we agreed immediately that that patient could continue the course of treatment. There was no broader implication to anything that the judge decided when she rejected the intervention. Second, she is wrong on this historical accident point. It is true that Hawaii Medical Center was in Chapter 11 as it had been before. This was not the first time that hospital had been there, but efforts were being made to keep that hospital alive when Queens made its decision. The events that happened afterward were not of Queens' making, and they were in truth historical accidents. She is also wrong in suggesting that there is more to this than a claim for economic damages. Judge, excuse me, Dr. Lederer claims that he will lose about half the business for a short period of time under American passage and the other decisions of this court. That sort of transitory economic impact does not rise to the level of irreparable injury that would trigger an injunction. It's, the judge looked at and considered interests of patients, some of whom, and future patients, some of whom have never even heard of Dr. Lederer in deciding what relief she would give, but bringing all of that into the calculus affects only one of the criteria for a preliminary injunction. That's arguably the public interest. It doesn't affect certainly the balancing of the equities between the two parties, and it doesn't affect whether they're likely to succeed on the merits. So she should not have weighed all of these other perceived interests about patient anxiety in the mix. Queens had well-trained doctors standing ready, able, and willing to serve these patients. And the fact that Dr. Lederer might have had some dislocation in his practice for a period of time doesn't trigger the right to an injunction. I don't know, Judge Thomas, if you want me to answer your question about mediation. You don't mind, yeah. We have, it's one of the few cases in my experience where the Ninth Circuit Mediation Office has not affirmatively reached out. We didn't reach out to the mediation office, but I suspect we would not turn down an invitation if one were to come. Okay, very good. Thank you. Thank you. Well, thank you both very much for a very able argument, and we appreciate it. The case discharge will be submitted, and the court will stand at recess for the day.
judges: Reinhardt, Thomas, Paez